WILLIAM R. RILEY v. RYNIER J. WORTENDYKE, EXECUTOR OF THE ESTATE OF JOSEPHINE SULK, DECEASED.

Submitted July 8, 1910—Decided November 9, 1910.

1. A bond given on an appeal from a District Court, unlike that given on an appeal from the small cause court, does not come from the District Court to the reviewing tribunal, and is therefore not before this court for the purpose of dealing with a defect in it.
2. One of the essentials in every novation is a previous valid obligation.
3. Under the facts proved in this case—*Held*, that a judgment of nonsuit in the District Court must be sustained.

On appeal from the Second District Court of Jersey City and on motion to dismiss appeal.

Before Justices GARRISON, SWAYZE and VOORHEES.

For the appellant, *McDermott & Enright.*

For the defendant, *Frank W. Hastings.*

The opinion of the court was delivered by

VOORHEES, J. This is an appeal from a judgment of nonsuit rendered by the District Court.

A preliminary motion to dismiss the appeal because the appeal bond is defective was made, and will be first considered.

It has been argued as if the facts had been made to appear judicially to the court. The defect alleged is that the bond was not signed by the appellant but by his attorneys-at-law. I am of opinion that this fact does not appear. The bond, unlike that given on an appeal from the small cause court, does not come from the District Court to the reviewing tribunal, and is therefore not before us. The motion to dismiss therefore should be denied, with costs.

Coming then to a consideration of the appeal, which was submitted upon briefs, we find that the suit was brought November 4th, 1909, against the executor of Josephine Sulk, deceased, and, as appears by the state of demand, to recover $500 from her estate for board, services and care furnished by the plaintiff and his wife to the deceased, during her lifetime, and to her children, from October 1st, 1896, to October 9th, 1908, a period of twelve years, and also for money loaned and advanced by the plaintiff and his wife to the decedent at various times between the same dates, "being not less than $20 in each year," with interest, and which the said decedent, on September 6th, 1908, having stated and settled her account with the plaintiff at $500, promised to pay him that amount. The state of demand further sets out that the decedent on that day assigned to the plaintiff $500 due as aforesaid, by the following writing directed to her daughter, Marguerite Sulk, who at that time had the custody of her funds and property:

"For Marguerite—I want Will Riley to have $500 of my own money & Fannie $50 and that picture of father and mother and the large oil painting I bought myself and clothes —don't fail to give Elsie my watch & pin & the picture of me and you children—Sept. 6, 1908,"

"JOSEPHINE SULK."

The only witness sworn was the wife of the plaintiff, at the close of whose testimony the plaintiff rested his case, and thereupon the defendant moved for a nonsuit, which was granted.

The specification of grounds for reversal are substantially that the proofs made out a *prima facie* case for the recovery

of some amount, any indefiniteness as to the exact amount not being a ground for nonsuit; and that they also show a recognition of liability by the defendant's decedent and a liquidation of that amount by the written instrument above set forth.

The plaintiff's wife was the niece of Mrs. Sulk; the latter being accustomed to visit, during the summers, at her niece's home at Sharon Station, N. Y., from 1896 to 1902, when, in March of that year plaintiff removed to Sharon, where decedent continued her summer sojourns down to the time of her death, with perhaps the exception of three or four years. Upon these visits, which would be of about a month's duration, she sometimes brought her children with her, and at the end of the visits she usually handed to her niece small amounts, running from $15 to $18. It was inferred that these sums came to the decedent from her husband by mail as they were generally handed by her to her niece after having received money in that manner.

It was the custom of the decedent, as the witness testified, "to borrow back" these sums of money shortly after they were paid, to pay her bills with, and sometimes for other purposes. The plaintiff maintained his household and his wife testified that she never gave back the moneys paid to her by Mrs. Sulk without first getting plaintiff's consent.

Mrs. Sulk, until her last visit, came down of her own accord, after informing her niece by letter that she intended to visit her. Nothing was said about the amount of board she was to pay. On the occasion of her last visit, August 13th, 1908, decedent's daughter came with her. That visit continued until October 10th, at which date Mrs. Sulk died at her niece's home. The money which was paid from time to time was in different amounts and they bore no relation to the length of time she had remained and no mention of any rate of board was made.

At the beginning of the last visit the daughter, Marguerite, gave the plaintiff's wife $10, Mrs. Sulk having said "Margaret, give Fannie some money." A week or two after that the son gave the plaintiff's wife $20 or $25, saying: "Here is a little

that will help out until I can see the boss" (meaning Mrs. Sulk's husband, his father), and after that the plaintiff received a postal order for $25 from Mr. Sulk.

There was no agreement about board until the last year, 1908, then Marguerite tried to make one for the last two weeks. There was a difference of fifty cents a week between her and the witness, for the two children, which witness did not agree to take, and after Marguerite had figured it up, she paid a certain sum in the latter part of September, 1908.

As to the borrowed moneys the testimony is that decedent "always spoke about it from time to time." "I will pay you back some day as soon as I can, all that you have ever done for me." "It was a great help and all like that." She said "she never could repay me for one thing." But all these occurred at different times while the plaintiff lived at Sharon Station before 1902, and during the last year, 1908. At the latter time she said: "Will Riley, I don't know what I'd ever done without you." "I don't know how I can ever repay you for what you have done for me;" that "she would make it all right as soon as she could."

On September 6th, 1908, about a month before her death, Mrs. Sulk called the witness to her, saying she wanted to show her something, and then sat down and wrote the paper above set forth. Witness did not know what it was at the time or what it had reference to. Decedent then put it in her dress, and a little while after she went to the yard, and when she came in handed the paper to the witness, telling her to put it in an envelope and keep it a while. Witness took the paper, but did not show it to her husband till some days afterward, having forgotten about it. There was no conversation about the paper or its nature at the time.

After this paper had been signed and delivered, the decedent from time to time continued to speak in the same indefinite manner as she had always done about repaying.

It was also in evidence that during the last visit she signed what the witness believed was a mortgage paper and told the witness if she "came down to Jersey City to the bank to receive it and she could get it in her hand, the money received

from the bank, she would give us some." She said she would pay every dollar, that we had done so much for her, and also said "If I can get it, I will give you $500 anyway, if I can get hold of it."

There was testimony that Mrs. Sulk had told the witness that Margaret, her daughter, was authorized to take care of her affairs. No account of any board had ever been kept. Witness said she once asked her if she could not give her something at Sharon Station, but never received any money, and no request for money was made thereafter.

The demand was made as follows: "Aunt Joe, I hope you can give me back some of the money, because bills are coming due the first of the month that have to be paid," and she said she could not pay me then, but would as soon as she could. That occurred some eight years before the suit was brought. It was further stated that Mrs. Sulk never paid any money personally after removing to Sharon in 1902, but some of the family paid money after that.

It appeared that after Mrs. Sulk's death a claim was prepared by a Connecticut lawyer, signed by the plaintiff and his wife. This demand was for a "balance due on board and for care, attendance and nursing from August 13th, 1908, to October 10th, 1908."

The husband, as head of the household, is responsible for the support of his wife and therefore, if board and lodging, care and attendance were furnished to Mrs. Sulk, with the expectation of remuneration, that remuneration, the law holds the husband, not the wife, responsible for, unless there is an express promise on the part of the wife to pay it, and credit on the faith of that promise is extended to her. In *Feiner* v. *Boynton,* 44 *Vroom* 136, it was held that a debt incurred for the necessary clothing of a married woman is presumably the debt of the husband, and if incurred by the wife, it is presumed that she is acting as the agent of her husband, unless there is affirmative evidence to show that she intended to charge her separate estate, and in *Wilson* v. *Herbert,* 12 *Id.* 454, it is said:

"In order to fix upon her a liability, it must affirmatively

appear that she made the purchase on her individual credit. There must be either an express contract on her part to pay out of her separate estate, or the circumstances must be such as to show clearly that she assumed individual responsibility for the payment, exclusive of the liability of her husband."

So far as the board is concerned, therefore, her separate estate should not be charged with it, because there is an absence of any express promise on her part to pay it.

The conversation during the last visit was not definite, at the most it was to appropriate certain moneys from a so-called mortgage, if she could get them. What the paper was is not proved.

There was no promise which indicated that the wife would pay exclusive of the liability of the husband. These so-called promises seem to have been rather expressions of gratitude for kindness than a creation of liability. If the original credits were given to the husband for the board, and that is the presumption, fortified by his payments, since 1902, of sums on account, then the wife's verbal promise to pay would not only be without consideration, but would be without validity, by reason of the statute of frauds.

It seems clear that the claim for board was one that could not have been recovered against the wife's estate.

Turning now to the alleged loans, it appears conclusively that they were all made before the year 1902, and hence within the bar of the statute of limitations, from which a verbal promise would not extricate them.

The plaintiff, however, relies upon a novation and seeks to derive this from the paper signed by the decedent. Neither branch of the case, for board or for money loaned, is helped by the paper signed by Mrs. Sulk.

That instrument was clearly an attempt to make a testamentary disposition of her property. She not only by it gives to the plaintiff and his wife money and articles, but she as well gives to her own daughter her watch and other articles. Obviously it is an intended but ineffectual testamentary writing. It does not mention any claim for board or borrowed money,

nor was there any verbal statement at the time of its preparation or delivery of a purpose by it to repay either a debt or a loan, if such proof were admissible. But as we have before observed, there was no valid existing obligation for it to rest upon, if the paper were evidential for the purpose.

One of the essentials in every novation is a previous valid obligation. See 29 *Cyc.* 1130, where the rule is stated and cases are collected.

In *Morecraft* v. *Allen,* 49 *Vroom* 729, there were mutual claims of each party against the other, so recognized by the parties, and for that reason not within the statute of limitations, and these formed a sufficient foundation for the new contract which was clearly proved.

We conclude, therefore, that there was no error in the proceedings of the District Court, and that the judgment should be affirmed, with costs.